UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


STACE PRYOR,                        )
                                   )
                      Plaintiff,   )
                                   )
           v.                      )        No.  4:12CV862 NCC
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,[1] )
                                   )
                      Defendant.   )


## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Stace Pryor's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401, *et seq.*, and his application for supplemental security income under Title XVI

of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the

undersigned United States Magistrate Judge, with consent of the parties, pursuant

to 28 U.S.C. § 636(c).  Because the final decision is not supported by substantial

evidence on the record as a whole, the decision of the Commissioner is reversed.


[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for Michael J. Astrue as the proper defendant in this cause.  Fed. R.
Civ. P. 25(d).

# I. Procedural History

Plaintiff Stace Pryor filed his applications for disability insurance benefits (DIB) and for supplemental security income (SSI) on May 28, 2009, alleging that he became disabled on December 11, 2006, because of problems with his right shoulder, major depressive disorder with suicidal tendencies, and borderline dual personality disorder.  (Tr. 97-103, 142.)[2]  On December 28, 2009, the Social Security Administration denied plaintiff's claims for benefits.  (Tr. 45, 46, 48-52.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on July 16, 2010, at which plaintiff and a vocational expert testified. Plaintiff's spouse also testified at the hearing.  (Tr. 8-24.)  On August 31, 2010, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work in the national economy such as small products assembler, laundry bagger, and electronics worker.  (Tr. 8-21.)  On March 15, 2012, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 2-6.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff contends that the

---

[2]  Although the administrative transcript contains copies of the Social Security Administration's ruling on plaintiff's application for SSI benefits, the transcript does not contain a copy of the application for SSI benefits itself.

Commissioner's final decision is not supported by substantial evidence on the record as a whole.  Specifically, plaintiff argues that evidence before the ALJ and submitted to the Appeals Council shows that he has a condition that gives rise to spontaneous spleen ruptures and that such condition should have been considered a severe impairment in the disability determination.  Plaintiff also argues that the ALJ failed to fully develop the record and therefore had an insufficient basis upon which to assess plaintiff's residual functional capacity (RFC), arguing further that the RFC assessment was not based upon medical evidence and failed to account for the effects of his severe mental impairments.  Finally, plaintiff claims that the ALJ's flawed RFC assessment resulted in a faulty hypothetical question posed to the vocational expert.  Plaintiff requests that the final decision be reversed and that he be found disabled.

## II.  Testimonial Evidence Before the ALJ

A.    Plaintiff's Testimony

At the hearing on July 16, 2010, plaintiff testified in response to questions posed by the ALJ.  Plaintiff was not represented by counsel at the hearing.

At the time of the hearing, plaintiff was thirty-six years of age.  Plaintiff stands five feet, eight inches tall and weighs 175 pounds.  Plaintiff is right-handed. Plaintiff is married and lives in a trailer with his wife and four-year-old child. Plaintiff completed the seventh grade and has his GED.  Plaintiff has had no

vocational training.  (Tr. 28-31.)

Plaintiff's Work History Report shows plaintiff to have worked as a stacker at a saw mill in April and May 2008.  From October to December 2008, plaintiff worked as a deli worker at a grocery store.  (Tr. 180.)  Plaintiff testified that he has worked numerous jobs within the previous fifteen years—including as a dishwasher, a metal finisher, and a cook at a fast food restaurant—but that he stayed no longer than six months at any given job.  (Tr. 31.)

Plaintiff testified that he cannot work because of pain in his right shoulder. Plaintiff testified that he underwent surgery but that the surgery did not resolve the pain.  Plaintiff testified that the pain worsens if he moves his shoulder or engages in a lot of writing.  Plaintiff testified that he last took prescription pain medication about four months prior and currently just "weather[s] it out."  (Tr. 32-33.)

Plaintiff testified that his spleen spontaneously ruptured in November and again in early December.  Plaintiff testified that the doctors cannot determine the cause of the ruptures.  Plaintiff testified that he had an upcoming appointment regarding the condition and was planning to ask that the spleen be removed.  (Tr. 33-34.)

As to his mental condition, plaintiff testified that he has felt sad and lonely since his childhood.  Plaintiff also testified that he was paranoid.  Plaintiff testified that such paranoia manifested in his job history in that he would think he was

going to be fired so he would quit.  Plaintiff testified that he hears various kinds of

voices, some of which tell him to kill himself.  Plaintiff testified that he last

attempted suicide ten years prior, after which he was hospitalized for two weeks.

Plaintiff testified that he currently takes medication as prescribed by his

psychiatrist to keep "the voices from aggravating [him]."  Plaintiff testified that

other prescribed medications do not seem to help at their present dosage.  (Tr. 36-

39.)

Plaintiff testified that he sleeps an hour or two at night and has difficulty

sleeping because of racing thoughts.  (Tr. 39.)

As to his daily activities, plaintiff testified that he walks a lot, both inside

and outside, because he cannot sit still.  Plaintiff testified that he might mow the

lawn but must stop because of the vibration.  Plaintiff testified that he has a

driver's license and occasionally drives.  (Tr. 30, 39-40.)

B.     Testimony of Plaintiff's Spouse

Jody Pryor, plaintiff's spouse, testified in response to questions posed by the

ALJ.  Mrs. Pryor testified that she receives disability benefits through SSI.  (Tr.

30.)

Mrs. Pryor testified that plaintiff has been prescribed Darvocet for his

shoulder pain but fills the medication only when he can afford it.  Mrs. Pryor

testified that plaintiff's doctor told him that he could not work because of his

ruptured spleen inasmuch as getting hit could kill him.  (Tr. 33.)

Mrs. Pryor testified that she has known plaintiff to be depressed since they were married.  (Tr. 37.)   Mrs. Pryor testified that a previous employer witnessed plaintiff talking to spirits.  (Tr. 40-41.)

C.    Testimony of Vocational Expert

Lori McQuade, a vocational expert, testified in response to questions posed by the ALJ.

Ms. McQuade testified that plaintiff had no past relevant work that qualified as substantial gainful activity.  (Tr. 43.)

The ALJ asked Ms. McQuade to assume an individual of plaintiff's age, education, and work experience, and to further assume the individual to be limited to light work "with lifting at the 20 pounds occasionally and 10 pounds frequently, no repetitive pushing and pulling with the arms, and limited public contact."  (Tr. 43.)  In response to the ALJ's question whether such a person could perform any unskilled work, Ms. McQuade testified that the person could perform work as a small products assembler, of which 500 such jobs existed locally and 900,000 nationally; as a laundry bagger, of which 1,500 such jobs existed locally and one million nationally; and as an electronics worker, of which 500 such jobs existed locally and 800,000 nationally.  (Tr. 43.)

### III.  Medical Evidence Before the ALJ

An MRI taken of plaintiff's right shoulder on September 22, 2006, in response to plaintiff's complaints of chronic shoulder pain and limited range of motion showed severe rotator cuff tendinopathy with partial tearing along the bursal surface of the supraspinatus tendon adjacent to the acromioclavicular joint. Mild downward sloping of the lateral aspect of the distal acromion was also noted. (Tr. 244.)

On October 6, 2006, plaintiff visited Dr. Michael Merkley of Midwest Orthopaedic Center for evaluation of the right shoulder.  Plaintiff reported having injured his shoulder in 1991 and that he was experiencing increasing pain within the previous few months, causing him to be unable to lift objects.  Physical examination showed no atrophy.  Plaintiff had active forward elevation to 165 degrees and equivocal Neer impingement and Hawkins reinforcement signs.  No tenderness about the distal clavicle was noted.  Plaintiff's supraspinatus strength and external rotator strength were measured to be 4+/5.  Plaintiff's load/shift was noted to be positive both posteriorly and anteriorly.  X-rays showed posterior subluxation.  Dr. Merkley diagnosed plaintiff with posterior subluxation of the right shoulder.  Dr. Merkley suspected some secondary bursal symptoms due to the instability of the shoulder and recommended that plaintiff undergo EMG/NCV studies to determine whether underlying suprascapular neuropathy was present.

Dr. Merkley opined that physical therapy may be indicated but expressed doubt that therapy would stabilize the shoulder. Plaintiff was instructed to return after EMG/NCV testing. (Tr. 241.)

EMG studies performed on October 9, 2006, showed some mild irritability but yielded essentially normal results. (Tr. 237-38.)

Plaintiff returned to Dr. Merkley on November 3, 2006, with continued complaints of painful instability of the right shoulder. Surgical repair was planned. (Tr. 229.)

On December 13, 2006, plaintiff underwent arthroscopic debridement of the anterior-superior labrum and arthroscopic capsulorraphy of the posterior-inferior capsule with closure of the rotator interval. (Tr. 226-27.)

During follow up examination on January 2, 2007, Dr. Merkley stressed to plaintiff the importance of staying in his brace for recovery. Dr. Merkley determined to keep plaintiff in the brace for another four weeks and to reevaluate at that time. (Tr. 225.)

On February 16, 2007, plaintiff failed to appear for a scheduled appointment with Dr. Merkley. (Tr. 223.) On February 20, plaintiff returned to Dr. Merkley and complained of tightness and pain in his shoulder. Dr. Merkley noted plaintiff to have passive forward elevation to 120 degrees, adduction and external rotation to seventy degrees, adduction and internal rotation to minus sixty degrees, and

external rotation at the side to fifty degrees. Dr. Merkley instructed plaintiff to advance his motion and to work on light rotator cuff strengthening and scapular stabilization. Physical therapy was prescribed. (Tr. 221, 222.)

Between March 2 and April 23, 2007, plaintiff participated in physical therapy on eight occasions. It was noted that plaintiff missed eight sessions during this period as well. (Tr. 214-20.)[3]

Plaintiff returned to Dr. Merkley on April 27, 2007, and reported having popping and snapping in the right shoulder but with no pain. Plaintiff reported that he was doing very well. Examination of both shoulders showed status post arthroscopic capsulorrhaphy at the right shoulder and multi-directional instability with posterior inferior subluxation at the left shoulder. Dr. Merkley determined that the right shoulder needed further cuff strengthening before surgical intervention for the left shoulder could be considered. (Tr. 215.)

On July 11, 2007, plaintiff underwent arthroscopic capsulorraphy with rotator interval closure at the left shoulder. (Tr. 245-46.) During follow up on July 20, Dr. Merkley determined for plaintiff to stay in his brace for four additional weeks. (Tr. 213.) On August 24, plaintiff was removed from the brace and referred for physical therapy. (Tr. 210.)

---

[3] Plaintiff was discharged from physical therapy on May 11, 2007, because of his failure to attend. (Tr. 214.)

On October 5, 2007, plaintiff failed to appear for a scheduled appointment with Dr. Merkley.  (Tr. 209.)

Plaintiff visited Dr. Julius F. Punzalan on October 21, 2008, with complaints of depression and difficulty with sleep.  Plaintiff reported that he easily gets upset.  Plaintiff reported having previously taken medication for depression.  Dr. Punzalan noted that plaintiff appeared distressed.  Plaintiff was diagnosed with depression and was prescribed Celexa.  (Tr. 274.)

Plaintiff returned to Dr. Punzalan on January 2, 2009, and complained of persistent right shoulder pain and questioned whether it was chondrolysis associated with his past surgery.  Examination showed pain and limitation of movement.  Plaintiff was referred for further evaluation, and an MRI was ordered.  (Tr. 273.)

An MRI taken of the right shoulder on January 17, 2009, showed intrasubstance tears of the supraspinatus and infraspinatus tendons.  There was no indication of a complete tear.  Degenerative changes of the acromioclavicular joint with mild mass effect on the subacromial joint space were noted, as well as fraying of the inferior fibers of the superior labrum.  (Tr. 278.)

Plaintiff visited Dr. Jeffrey Griesemer at Family Medical Center on May 5, 2009, with complaints of depression and shoulder pain.  Plaintiff reported that he currently had trouble with depressed mood, concentration, insomnia, energy,

appetite, and thoughts of death.  It was noted that plaintiff had attempted suicide on one occasion in the distant past and currently had no suicidal ideations.  Dr. Griesemer noted plaintiff to have an appropriate affect but to be somewhat anxious.  Dr. Griesemer diagnosed plaintiff with depression and prescribed Prozac. With respect to plaintiff's right shoulder, physical examination showed crepitus and pain with lateral extension.  Supraspinator weakness was also noted.  Empty can test was positive.  Plaintiff was able to reach behind his back.  Dr. Griesemer referred plaintiff for an orthopaedic evaluation.  (Tr. 260-63.)

Plaintiff visited Dr. Merkley on June 9, 2009, with complaints of persistent right shoulder pain associated with movement.  It was noted that plaintiff was concerned regarding possible complication from an intra-articular pain pump that was placed with postoperative analgesia and that he was considering joining a class action lawsuit against the pump's manufacturer.  Physical examination showed no obvious clinical deformity, muscular atrophy, or erythema.  Diffuse tenderness to palpation was noted, extending into the pectoris and the triceps.  Smooth passive external rotation to sixty degrees was noted with full symmetric active forward elevation.  Rotator cuff strength was noted to be 4-4+/5.  X-rays of the right shoulder were normal.  Dr. Merkley found there to be no evidence of chondrolysis associated with the pain pump and suspected plaintiff's persistent pain to be related to soft tissue irritation.  (Tr. 205.)

On June 11, 2009, plaintiff reported to Dr. Griesemer that he stopped taking Prozac because of side effects. Plaintiff reported continued significant depressive symptoms but no hallucinations or manic symptoms. Mental status examination showed plaintiff to be oriented times three. Plaintiff's insight was normal, and recent and remote memory was intact. Plaintiff's affect was noted to be flat. Plaintiff continued to be diagnosed with depression and was prescribed Wellbutrin. (Tr. 256-59.)

Plaintiff did not appear on June 19, 2009, for a scheduled appointment with Dr. John D. Mahoney at Midwest Orthopaedic Center. (Tr. 204.)

Plaintiff visited Dr. Punzalan on August 21, 2009, for medication refills. It was noted that plaintiff took Ranitidine, Bupropion, and Indomethacin. Plaintiff also complained of numbness in the midsection of the right arm with burning and shooting pain. Plaintiff reported that he was doing fine with his chronic right shoulder pain, and Dr. Punzalan noted plaintiff to be seeing an orthopaedist for the condition. Plaintiff was diagnosed with depression and right shoulder pain and was continued on his current medications. (Tr. 272.)

Plaintiff underwent a consultative physical examination on November 19, 2009, for disability determinations. Plaintiff reported his right shoulder pain to have worsened since surgery and that he experienced pain at a level eight or ten. Plaintiff reported that he did not have full range of motion about the right shoulder.

Plaintiff reported his left shoulder to be fine. Dr. John Demorlis questioned plaintiff's effort when asked to perform range of motion exercises, noting that plaintiff had near full range of motion when passively performed by Dr. Demorlis. No atrophy was noted. Reflexes were normal as well as grip strength. With respect to his functional abilities, plaintiff reported that he had no trouble walking or standing but could sit for only five minutes because of his shoulders. Plaintiff also reported that he could ride in a car "300 miles." Plaintiff reported being able to lift ten to twenty pounds with his left arm but that he experienced pain with lifting just a soda bottle with his right arm. With respect to his depression, plaintiff reported that he was very moody and wanted to cry, but that he did not take his medications for the condition. Plaintiff reported that he had attempted suicide and tried to hurt himself on six or seven occasions and that a voice in the back of his head tells him to engage in such activity. Dr. Demorilis noted plaintiff's mental status examination to be normal except for the dubious effort in performing shoulder exercises. Dr. Demorlis diagnosed plaintiff with chronic right shoulder pain, post right and left arthroscopic posterior stabilization and capsulorraphy, and apparent depression. (Tr. 321-26.)

On December 15, 2009, plaintiff underwent a consultative psychological examination for disability determinations. (Tr. 229-32.) Plaintiff reported that his mood was always down and that he felt hopeless. Plaintiff reported that he rarely

slept and was nervous quite often.  Plaintiff reported having problems with concentration and memory.  Plaintiff reported that he sees ghosts and spirits and hears voices in his head telling him to get rid of himself.  Plaintiff reported having previously been diagnosed with attention deficit hyperactivity disorder (ADHD) and borderline personality disorder.  Mental status examination showed plaintiff's grooming to be neglected.  Plaintiff was restless and fidgety, and his interpersonal style was irritable.  Dr. Barbara Markway noted plaintiff's attention to be adequate for purposes of the exam.  Plaintiff was able to answer arithmetic problems and similarities problems, but answers involving common sense and social judgment were poor.  Plaintiff's performance on memory tasks was poor, but Dr. Markway questioned whether plaintiff was giving his best effort.  Dr. Markway diagnosed plaintiff with ADHD, mood disorder not otherwise specified, and personality disorder with borderline and antisocial features.  Dr. Markway assigned a Global Assessment of Functioning score of 50, indicating serious symptoms.[4]  (Tr. 329-31.)  Dr. Markway summarized:

> He is a rather unpleasant individual whose main issue appears to be long-standing personality problems.  His social adjustment in terms of work and relationships has been marginal.  His mental status today was grossly intact, although there were problems with memory.  I was not convinced, however, that he was putting forth his best effort.

(Tr. 331.)

---

[4] *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision 34 (4th ed. 2000).

On December 24, 2009, Mark Altomari, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's ADHD, mood disorder, and personality disorder caused mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Tr. 333-44.) In a Mental RFC Assessment completed that same date, Dr. Altomari opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in his ability to understand and remember detailed instructions but was not significantly limited in his abilities to understand and remember very short and simple instructions or to remember locations and work-like procedures. In the domain of Sustained Concentration and Persistence, Dr. Altomari opined that plaintiff was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or proximity to others without being distracted by them. Dr. Altomari further opined that plaintiff had no significant limitations in his abilities to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a

normal workday and workweek without interruptions from psychologically-based symptoms; or to perform at a consistent pace without an unreasonable number and length of rest periods.  In the domain of Social Interaction, Dr. Altomari opined that plaintiff was moderately limited in his abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Dr. Altomari further opined that plaintiff had no significant limitations in his abilities to ask simple questions or request assistance, or to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  In the domain of Adaptation, Dr. Altomari opined that plaintiff suffered no significant limitations in any regard.  (Tr. 345-46.) Dr. Altomari concluded that plaintiff

> retains the ability to understand and remember simple instructions. . . . The claimant can carry out simple work instructions.  He can maintain adequate attendance and sustain an ordinary routine without special supervision. . . . The claimant can interact adequately with peers and supervisors in a work setting that has minimal demands for social interaction. . . . The claimant can adapt to most usual changes common to a competitive work setting.

(Tr. 347.)

On December 28, 2009, Stephanie Wilson, a single decision maker with disability determinations, completed a Physical RFC Assessment in which she opined that plaintiff could lift twenty pounds occasionally and ten pounds

frequently; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and had no limitations in pushing and/or pulling. Ms. Wilson further opined that plaintiff should never climb ladders, ropes, or scaffolds but otherwise had no postural limitations. Ms. Wilson opined that plaintiff had no manipulative, visual, or communicative limitations. With respect to environment limitations, Ms. Wilson opined that plaintiff should avoid all exposure to hazards, avoid even moderate exposure to vibration, and avoid concentrated exposure to extreme cold. (Tr. 348-53.)

## IV. Medical Evidence Submitted to Appeals Council[5]

Plaintiff was admitted to Barnes Jewish Hospital on January 15, 2010, with complaints of abdominal pain. Plaintiff reported having had abdominal pain for about one year with increasing pain during the previous two months that abruptly became worse. A CT scan showed plaintiff to have a ruptured spleen. Laboratory testing was performed to determine the etiology of the spontaneous rupture, but the results were still pending upon plaintiff's discharge. Plaintiff was discharged on January 19 with instructions to avoid heavy lifting, lifting in excess of ten pounds, strenuous activity, and all contact sports. Plaintiff's discharge medications

---

[5] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision. The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

included Bupropion for depression, Celebrex and Tramadol for pain, and Ranitidine for sleep.  (Tr. 476-510.)

Plaintiff was readmitted to Barnes Jewish Hospital on January 28, 2010, with severe abdominal pain.  A CT scan showed splenic rupture.  It was noted that plaintiff had been admitted about ten days prior for splenic rupture and that the condition was conservatively treated at that time.  It was opined that plaintiff's splenic ruptures were likely secondary to pancreatitis.  Plaintiff underwent a splenic artery embolization which was determined to be successful.  (Tr. 443-65.) Upon discharge on January 31, plaintiff was prescribed Bupropion, Celebrex, and Ranitidine as well as Percocet.  Plaintiff was instructed not to drive while taking narcotic medication and not to participate in full contact sports.  (Tr. 436-37.)

Plaintiff visited the Surgery Clinic at Barnes Jewish Hospital on March 25, 2010, for follow up.  Plaintiff reported having continued pain since his release on January 28 but that Darvocet mostly controlled the pain.  Plaintiff reported his pain to be at a level five.  Plaintiff reported a decrease in appetite and a weight loss of forty pounds.  Plaintiff reported having difficulty walking, getting dressed, and bathing.  Plaintiff reported having memory problems as well as difficulty with activities of daily living.  Plaintiff was instructed to obtain a copy of his most recent CT scan.  (Tr. 534-38.)

Plaintiff returned to the Surgery Clinic on April 1, 2010.  It was noted that a

CT scan dated March 22, 2010, showed a lateral new collection described as a seroma or infarct. Plaintiff was instructed to continue with Darvocet for pain and to return in one month for follow up. (Tr. 525-26.)

Plaintiff was admitted to Barnes Jewish Hospital on September 15, 2010, with complaints of recurrent abdominal and epigastric pain since January 2010. Plaintiff reported a weight loss of approximately sixty pounds since January. Plaintiff's history of ruptured spleen was noted, as well as his history of recurrent pancreatitis, depression, gastroesophageal reflux disease, and questionable cholelithiasis (gallstones). Upon testing and examination, plaintiff was admitted with a diagnosis of acute renal failure, most likely secondary to acute tubular necrosis. A renal sonogram and renal artery doppler testing showed no evidence of renal artery stenosis, but evidence compatible with renal parenchymal disease was noted. Splenomegaly and intrasplenic hematoma were also noted. A CT scan of the abdomen showed evidence of relatively recent bleeding on the spleen. (Tr. 367-75, 394-95, 398-99.) It was determined that a splenectomy would not be performed given plaintiff's resolving renal failure. Plaintiff was discharged on September 21 in stable condition with instruction to engage in activities as tolerated. Upon discharge, plaintiff was diagnosed with acute renal failure, splenic rupture, anemia, and depression, which was noted to be stable. Plaintiff's discharge medications included Bupropion and Percocet. (Tr. 364-66.)

# V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through September 30, 2008. The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 11, 2006. The ALJ found plaintiff's status-post bilateral capsulorrhaphy of the shoulders, ADHD, mood disorder, and personality disorder to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ determined that plaintiff had the RFC to perform light work in that plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could stand and walk about six hours in an eight-hour workday, and could sit for at least six hours in an eight-hour workday. The ALJ found plaintiff's RFC to perform light work to be limited in that plaintiff was unable to do repetitive overhead reaching or repetitive pushing or pulling with the arms. The ALJ found plaintiff not able to perform any past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform jobs that exist in significant numbers in the national economy, and specifically, small products assembler, laundry bagger, and electronics worker. The ALJ found plaintiff not to be under a disability through the date of the decision

and denied plaintiff's claims for benefits.  (Tr.13-20.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether

the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment or combination of the same is not severe, then he is not disabled.  The Commissioner then determines whether claimant's sole impairment or a combination of impairments meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

Upon review of the entirety of the record, including the new evidence submitted to the Appeals Council, the undersigned finds the Commissioner's final decision not to be supported by substantial evidence on the record as a whole inasmuch as insufficient consideration was given to plaintiff's medically determinable spleen impairment, thereby affecting the RFC assessment in this case. For the following reasons, the matter must be remanded to the Commissioner for further proceedings.

At the hearing on July 16, 2010, plaintiff and his spouse testified that he had experienced spontaneous spleen ruptures within the previous nine months; that his doctors had been unsuccessful in determining the cause and advised him not to work because of the condition; and that he had an upcoming appointment for the condition. (Tr. 33-34.) In his written decision entered August 31, 2010, the ALJ acknowledged plaintiff's testimony that "he had experienced a ruptured spleen" (Tr. 15) but elaborated no further. The ALJ did not include this impairment among

plaintiff's severe impairments.

Medical evidence of plaintiff's spleen ruptures and related hospitalizations and treatment was not before the ALJ at the time of his decision but was submitted to the Appeals Council for review. The Appeals Council considered the new evidence and found it not to provide a basis for changing the ALJ's decision. (Tr. 2-3.) Because the Appeals Council considered this evidence in its determination not to review the ALJ's decision, the evidence is now part of the administrative record and must be evaluated by this Court in determining whether substantial evidence on the record as a whole supports the ALJ's decision. *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000).

The Commissioner does not dispute that the evidence submitted to the Appeals Council relates to plaintiff's condition as it existed on or before the ALJ's decision. *See* 20 C.F.R. §§ 404.970(b), 416.1570(b); *Box v. Shalala*, 52 F.3d 168, 171-72 (8th Cir. 1995). The Commissioner argues, however, that such evidence fails to establish that plaintiff could *not* perform the work as identified by the ALJ and thus that the ALJ's decision continues to be supported by substantial evidence. The Commissioner's argument is misplaced.

Despite testimony of multiple instances of spleen rupture—with related testimony that doctors were unsure of the cause, instructed plaintiff not to work, and continued to treat plaintiff through the date of the hearing—the ALJ gave only

passing reference to the condition in his decision and proceeded no further. The medical evidence submitted to the Appeals Council substantially supports plaintiff's hearing testimony. With only a cursory acknowledgement of this significant impairment[6] and nothing more, the ALJ essentially removed it from consideration in determining plaintiff's RFC. Although the Commissioner argues that consideration of plaintiff's spleen impairment would not have affected plaintiff's RFC such that he could not perform the work as identified by the ALJ, the determination of a claimant's RFC based upon *all* the relevant evidence of record is for the Commissioner to make in the first instance. As summarized above, such evidence now includes the unresolved etiology of the impairment, plaintiff's significant and rapid weight loss, continued associated bleeding, and kidney failure. This Court declines to speculate as to how the ALJ would have determined plaintiff's RFC had he had all the relevant evidence before him at the time of his decision. *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994) (reviewing court required to undergo "peculiar task" of speculating on how the ALJ would have weighed the new evidence).

The ALJ's failure to consider plaintiff's spleen impairment stems in part

---

[6] A ruptured spleen is a medical emergency that can cause life-threatening bleeding into the abdominal cavity. *Diseases & Conditions - Ruptured Spleen,* Mayo Found. for Med. Educ. & Research (Apr. 10, 2013), *available at* <http://www.mayoclinic.org/diseases-conditions/ruptured-spleen/basics/definition/CON-20029359>.

from his failure to adequately develop the record. An ALJ must fully and fairly develop the record so that a just determination of disability may be made. *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994). This duty is enhanced when the claimant is not represented by counsel. *Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998); *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994). Here, despite being presented with testimony that should have alerted him to the presence of this significant impairment, the ALJ did not investigate nor pursue any questioning that could have revealed whether and to what extent this impairment caused any functional limitations. Nor did the ALJ attempt to secure any medical records relevant to this impairment despite their obvious absence from the record. *Cox*, 160 F.3d at 1209 (need to more fully develop the record shown by absence of relevant medical reports). The ALJ's lack of investigation and inquiry is especially significant here where the plaintiff was not represented by counsel and had only a limited education. *Id.*; *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (superficial questioning of claimants with limited education likely to elicit responses that fail to accurately portray extent of limitations). "'Unfairness or prejudice resulting from an incomplete record – whether because of lack of counsel or lack of diligence on the ALJ's part – requires a remand.'" *Battles*, 36 F.3d at 45 n.2 (*quoting Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987)).

Here, it cannot be said that the ALJ's failure to develop the record regarding

plaintiff's spleen impairment resulted in a decision that was neither unfair nor lacked prejudice. As noted *supra*, the ALJ gave only passing reference to plaintiff's ruptured spleen in his decision, did not find it to be a severe impairment, and effectively removed it from consideration in determining plaintiff's RFC. *Cf. Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (misunderstanding of impairment and failure to find it to be severe may affect RFC findings); *Cunningham*, 222 F.3d at 501 (ALJ obligated to consider combined effects of impairments); *Henning v. Colvin*, 943 F. Supp. 2d 969, 993-94 (N.D. Iowa 2013) (ALJ must consider symptom-related limitations and restrictions of medically determinable impairments). Where an ALJ fails to consider the effects of a known medically determinable impairment, the RFC cannot be said to be supported by substantial evidence. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Henning*, 943 F. Supp. 2d at 997 (ALJ to consider on remand effect of medically determinable impairment both by itself and in combination with effects of other impairments).

Therefore, the matter will be remanded to the Commissioner with instruction to more fully develop the record on plaintiff's medically determinable spleen impairment. Upon remand, the parties should be allowed to supplement the record with any additional information that may assist the ALJ in making a determination as to whether this impairment constitutes a severe impairment at Step 2 of the

evaluation; and whether the effects of *all* of plaintiff's impairments, considered both singly and in combination, render him disabled. In making the RFC determination, the Commissioner is reminded that such determination must be based on some medical evidence on the record, *Cox*, 495 F.3d at 619, and that the opinion of a single decision maker does not constitute medical opinion evidence, *Dewey v. Astrue*, 509 F.3d 447, 449-50 (8th Cir. 2007). The Commissioner is encouraged upon remand to obtain medical evidence that addresses plaintiff's ability to function in the workplace, which may include contacting plaintiff's treating physician(s) to clarify plaintiff's limitations and restrictions in order to ascertain what level of work, if any, plaintiff is able to perform. *Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006). If upon such further consideration of all the relevant evidence, the Commissioner determines that vocational expert testimony continues to be necessary, the Commissioner is reminded that the hypothetical question posed to the vocational expert must capture the concrete consequences of all of plaintiff's relevant, credible impairments, *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010), and be consistent with the RFC determination as found by the ALJ in his decision, *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).

## VII. Conclusion

Therefore, for all of the foregoing reasons, the Commissioner's adverse

decision is not based upon substantial evidence on the record as a whole and the cause should be remanded to the Commissioner for further consideration consistent with this opinion. Because the current record does not conclusively demonstrate that plaintiff is disabled, it would be inappropriate for the Court to award plaintiff benefits at this time.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE


Dated this 20th day of March 2014.